UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RONNIE FLEMING,

 Plaintiff,       Case No. 18-cv-11573
            Hon. Matthew F. Leitman
v.

BRANDON SCRUGGS, *et al.*,

 Defendants.

                     /

## OPINION AND ORDER DENYING IN PART AND GRANTING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF No. 18)

According to Plaintiff Ronnie Fleming, he was peacefully riding his bicycle down a street in Pontiac, Michigan, when Defendants Brandon Scruggs and Ruben Garcia, two Oakland County Sheriff's Deputies, stopped him without reasonable suspicion and used excessive force – a Taser – to effect the stop.  In this action, Fleming alleges that the stop and the Tasing violated his Fourth Amendment rights and his rights under state law.  He brings claims against the deputies and against Defendant Oakland County.

The Defendants counter that the deputies stopped and Tased Fleming because he (1) matched the description of a parole absconder, (2) fled from them after they identified themselves and ordered him to stop, and (3) made what appeared to be an

1

effort to retrieve a weapon from his front pocket.  The Defendants have moved for summary judgment on Fleming's claims against the deputies based upon qualified immunity and state-law immunity.

The Defendants' motion does not take the facts in the light most favorable to Fleming.  On the contrary, in several key respects the Defendants' legal arguments rest upon a view of the facts – and inferences from the facts – that are most favorable to the deputies, not to Fleming.  Under the view of the facts that is most favorable to Fleming, the deputies did unlawfully stop him and did use excessive force against him when they Tased him.  But that does not mean that Fleming may proceed on all of his claims.

As explained below, the deputies are entitled to qualified immunity for their unlawful stop of Fleming because they reasonably relied upon a police bulletin and because their conclusion that they had reasonable suspicion to stop Fleming based upon his resemblance to the parole absconder described in the bulletin did not violate clearly established federal law.  However, the deputies are not entitled to qualified immunity for their use of excessive force because the Tasing of Fleming violated clearly established federal law.  Likewise, the deputies are not entitled to state-law immunity for the Tasing because a jury could find that they did not act in good faith.  Finally, Oakland County is entitled to summary judgment on all of the claims against it.

Accordingly, the Court will **DENY** the Defendants' motion for summary judgment on Fleming's Fourth Amendment claim and state-law tort claims against Deputies Scruggs and Garcia to the extent those claims are based upon the Tasing. However, the Court will **GRANT** the Defendants' motion for summary judgment in all other respects.

## I

On July 25, 2017, an unidentified employee of the Michigan Department of Corrections (the "MDOC") sent Sergeant Hix of the Oakland County Sheriff's Office (the "OCSO") a "be on the lookout" text message ("BOLO") about a parole absconder who had been observed on Nebraska Street in Pontiac, Michigan. (*See* BOLO, ECF No. 21-8, PageID.450; *see also* Scruggs Dep. at 30:11–34:5, ECF No. 18-5, PageID.166–167; Garcia Dep. at 14:7–15:19, ECF No. 18-6, PageID.176.) The BOLO, reproduced below, included a description and a photograph of the suspected absconder:



(BOLO, ECF No. 21-8, PageID.450.)

The BOLO did not provide the parole absconder's age, height, or weight. (*See id.*; *see also* Scruggs Dep. at 32:10–12, ECF No. 18-5, PageID.166.)  Nor did the BOLO contain any information about the nature of the absconder's conviction.  And the BOLO did not identify the caller who reported the absconder's location on Nebraska Street.  Notably, there is no evidence in the record that any law enforcement officer – including the MDOC employee who received that call or officers Hix, Scruggs, and Garcia – ever knew the caller's identity.

Hix forwarded the BOLO to Scruggs and Garcia the same day he received it (July 25, 2017). (*See* Scruggs Dep. at 33:16–34:5, ECF No. 18-5, PageID.167; Garcia Dep. at 14:4–23, ECF No. 18-6, PageID.176.)  There is no evidence in this

record that Scruggs and Garcia, after receiving the BOLO, made any effort to learn

more about the pictured parole absconder or the nature of his conviction.  As Garcia

has confirmed, the only information that he and Scruggs had about the suspected

absconder was the information contained in the BOLO. (*See* Garcia Dep. at 14:4–8,

ECF No. 18-6, PageID.176.[1])

On July 26, 2017, Scruggs and Garcia were on vehicle patrol in Pontiac

roughly one mile from the address on Nebraska Street at which the parole absconder

had been spotted the day before. (*See* Scruggs Dep. at 34:8–9, ECF No. 18-5,

PageID.167.)  Garcia drove while Scruggs sat in the passenger seat. (*See id.* at 28:9–

10, PageID.165.)  The deputies were driving a black Impala. (*See id.* at 19:10–15,

PageID.163.)  The vehicle did not have any outside markings that identified it as a

law enforcement vehicle. (*See* Garcia Dep. at 12:12–19, ECF No. 18-6, PageID.175.)

All of the windows in the vehicle except for the front windshield were tinted, and

the police lights for the vehicle were located inside the car. (*See id.* at 12:20–22;

Scruggs Dep. at 17:4–19:13, ECF No. 18-5, PageID.163.)

As the deputies were driving eastbound on South Boulevard to assist another

deputy who had initiated an unrelated traffic stop, they saw Fleming biking the

---

[1] At the cited transcript pages, Garcia first said that the description of the absconder
was: "[b]lack male, baseball cap, facial hair, riding a bike in the area." (Garcia Dep.
at 14:7–8, ECF No. 18-6, PageID.176.)  Garcia was then asked if the "only other"
information they had was that the absconder was "riding a bicycle." (*Id.*)  Garcia
responded, "yeah." (*Id.*)

opposite direction – toward them – on South Boulevard toward Woodward Avenue. (*See* Garcia Dep. at 13:2–3, ECF No. 18-6, PageID.176; Scruggs Dep. at 14:4–6, ECF No. 18-5, PageID.162.)   The dashcam video in their patrol vehicle recorded Fleming as he rode past on his bike. (*See* Dashcam Video at 00:02, ECF No. 18-4.)

As the deputies saw Fleming ride by, they concluded that Fleming resembled the BOLO's description of the parole absconder.   The deputies thought Fleming matched the BOLO in the following respects:

- Both Fleming and the parole absconder were African American men.

- Fleming was wearing a ball cap, and the parole absconder had been observed wearing a ball cap the day before.

- Both Fleming and the parole absconder had facial hair.

- Fleming was riding a bicycle, and the parole absconder had been observed riding a bicycle the day before.

- Fleming was located within a mile of the area in which the absconder had been observed the day before.

(*See* Garcia Dep. at 14:4–15:1, ECF No. 18-6, PageID.176.)

The deputies decided to stop Fleming. (*See* Scruggs Dep. at 30:9–13, ECF No. 18-5, PageID.166.)   The "sole basis for the stop" was the officers' belief that Fleming matched the BOLO's description of the parole absconder in the five ways described above. (Garcia Dep. at 14:9–10, ECF No. 18-6, PageID.176.)

But there were several notable differences between Fleming's appearance on the date of the incident and the description of the parole absconder.  First, Fleming was wearing shorts, not blue jeans. (*See* Dashcam Video, ECF No. 18-4; Fleming Photographs, ECF No. 21-7; BOLO, ECF No. 21-8, PageID.450.)  Second, Fleming was not wearing a chain around his neck, much less a prominent "big neck chain." (*See id.*)  Third, Fleming's facial hair was a graying goatee, whereas the absconder had a dark-black beard. (*See id.*)  Fourth, Fleming was roughly a mile away from where the absconder had been seen a day earlier. (*See* Scruggs Dep. at 34:8–9, ECF No. 18-5, PageID.167.)

After deciding to stop Fleming, the officers turned their vehicle around and started following Fleming. (*See id.* at 12:1–5, PageID.161; Dashcam Video at 00:02–00:23, ECF No. 18-4.)  Fleming looked back and saw the deputies' vehicle following him, but since the vehicle was unmarked, he was unable to identify it as a police vehicle. (*See* Fleming Dep. at 62:8–64:6, ECF No. 21-2, PageID.283–285.)  Moreover, he could not see the uniformed deputies through the vehicle's tinted windows. (*See id.* at 56:22–57:2, PageID.277–278.)

Fleming headed into a McDonald's parking lot, and the deputies followed him into that lot.  Fleming then biked out of the McDonald's lot and into the parking lot of the Motor City Burger next door, and the deputies again followed. (*See* Scruggs Dep. at 14:13–17:3, ECF No. 18-5, PageID.162–63; Dashcam Video at 00:35–01:06,

ECF No. 18-4.)  Finally, Fleming exited the Motor City Burger lot and began cycling down Earlmoor Boulevard, and the deputies sped up to follow him. (*See* Scruggs Dep. at 15:24–25, 22:3–24:25, ECF No. 18-5, PageID.162, 164; Dashcam Video at 01:06–01:40, ECF No. 18-4.)   Throughout the time that the deputies followed Fleming, they remained approximately 10 to 15 yards away from him. (*See* Scruggs Dep. at 16:6, ECF No. 18-5, PageID.162.)  Fleming did not speed up his pedaling at any point while the deputies were following him. (*See* Fleming Dep. at 61:22–62:3, ECF No. 21-2, PageID.282–283; Dwayne Hunter Dep. at 14:21–22, ECF No. 21-5, PageID.380; Malcolm Watkins Dep. at 9:9–18, ECF No. 21-6, PageID.420.)

At no point while the officers were following Fleming did they identify themselves. (*See* Fleming Dep. at 52:12–53:13, ECF No. 21-2, PageID.273–274.) Likewise, they did not order Fleming to stop, and they did not activate their police lights or siren. (*See id.*; Scruggs Dep. at 17:21–25, ECF No. 18-5, PageID.163.)  In fact, they "never gave [Fleming] a command of any kind." (Fleming Dep. at 69:13, ECF No. 21-2, PageID.290.)

As Fleming was riding his bike down Earlmoor Boulevard, he looked back at the deputies' vehicle and moved his left hand toward the left pocket of his shorts. (*See* Dashcam Video at 01:40–01:46, ECF No. 18-4.)   Shortly thereafter, Scruggs deployed his Taser on Fleming. (*See* Scruggs Dep. at 27:13–14, ECF No. 18-5, PageID.165; Garcia Dep. at 18:23, ECF No. 18-6, PageID.177; Fleming Dep. at

61:25–62:3, ECF No. 21-2, PageID.282–283.)  When the Taser struck Fleming, his body locked up, and he fell head-first off his bicycle and onto the curb. (*See* Scruggs Dep. at 27:25, ECF No. 18-5, PageID.165; Garcia Dep. at 19:5–9, ECF No. 18-6, PageID.177; Fleming Dep. at 86:10–11, ECF No. 21-2, PageID.307.)

After Scruggs Tased Fleming, Scruggs exited the vehicle, handcuffed Fleming, and radioed for medical assistance. (*See* Scruggs Dep. at 28:2–3, ECF No. 18-5, PageID.165.)  A female deputy then arrived on the scene to assist. (*See id.* at 28:12–29:2, PageID.165–166; Fleming Dep. at 71:16–73:7, ECF No. 21-2, PageID.292–294.)

As Fleming was lying wounded on the ground, he asked Scruggs: "why did you Tase me?  Why are you doing this?" (Hunter Dep. at 37:19–20, ECF No. 21-5, PageID.403.)  There is no evidence in the record that Scruggs responded directly to those questions.  But he did say to the female deputy who had arrived: "I'm just going to tell the judge he ran." (*Id.* at 38:23, PageID.404; *see also id.* at 14:13–14, PageID.380; Fleming Dep. at 73:14, ECF No. 21-2, PageID.294.)

As the deputies were waiting for medical assistance to arrive, they searched Fleming and found "a marijuana cigarette or a marijuana blunt" in Fleming's left front pocket. (*See* Scruggs Dep. at 28:7–8, ECF No. 18-5, PageID.165; Garcia Dep. at 24:11–15, ECF No. 18-6, PageID.178.)  Paramedics then arrived and transported Fleming to McLaren Hospital. (*See* Garcia Dep. at 23:16–19, ECF No. 18-6,

PageID.178.)  The officers later traveled to see Fleming at the hospital, where they photographed his injuries. (*See id.* at 23:24–24:1; *see also* Fleming Photographs, ECF No. 21-7.)

Fleming suffered serious injuries from the incident.  His face, head, and arms were "bloody and messed up from . . . the accident." (Fleming Dep. at 82:6–8, ECF No. 21-2, PageID.303.)  He also received stitches to the corner of his right eye, and he now has scars on his face, forehead, hands, and knees from the incident. (*See id.* at 83:4–8, 83:22-85:1 88:19, 90:23–24, PageID.304-306, 309, 311.)  He continues to suffer headaches and other pain (*see id.* at 83:15–17), and at one point Fleming's headaches were so bad that he "had to go to a vision doctor." (*Id.* at 91:25–92:1, PageID.312–313.)

## II

Fleming brings this action under 42 U.S.C. § 1983.  Fleming claims that Scruggs and Garcia violated the Fourth Amendment when they subjected him to a *Terry* stop that was not supported by reasonable suspicion.[2] (*See* Compl., ECF No. 1, PageID.7.)  Fleming also claims that Scruggs and Garcia violated the Fourth

---

[2] "A *Terry* stop is a type of encounter between police officers and citizens that is characterized as a 'temporary involuntary detention . . . which must be predicated upon reasonable suspicion' on the part of the officers that criminal activity is afoot." *United States v. Wilson*, 506 F.3d 488, 492 (6th Cir. 2007) (quoting *United States v. Bueno*, 21 F.3d 120, 123 (6th Cir. 1994)) (describing a *Terry* stop under *Terry v. Ohio*, 392 U.S. 1 (1968)).

Amendment by using excessive force in connection with the stop. (*See id.*)  Finally, Fleming brings a municipal liability claim against Oakland County and state-law tort claims against all Defendants. (*See id.*, PageID.7–13.)

Defendants filed their motion for summary judgment on July 26, 2019. (*See* Mot. for Summ. J., ECF No. 18.)  Defendants argue that Scruggs and Garcia are entitled to qualified immunity for their stop and use of force against Fleming. (*See id.*, PageID.99–105.)  Defendants also contend that Fleming's municipal liability claim against Oakland County fails because he cannot show that Scruggs and Garcia violated his constitutional rights and, in the alternative, because he has not established the elements of a failure to train claim for municipal liability. (*See id.*, PageID.106–109.)  Defendants further assert that Oakland County is immune from Fleming's state-law claims under Michigan's Governmental Tort Liability Act (the "GTLA"), Mich. Comp. Laws § 691.1407(1). (*See id.*, PageID.109.)  Finally, Defendants argue that Scruggs and Garcia are also immune from Fleming's state-law claims under the GTLA because they acted in good faith. (*See id.*, PageID.109–120; citing Mich. Comp. Laws § 691.1407(3).)

The Court held a hearing on Defendants' motion on November 18, 2019.  The Court ordered the parties to submit supplemental briefing to address several issues raised during the hearing, and the parties have done so. (*See* Fleming Supp. Br., ECF No. 25; Defs.' Supp. Br., ECF No. 28.)

11

# III

## A

A movant is entitled to summary judgment when it "shows that there is no genuine dispute as to any material fact." *SEC v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 326–27 (6th Cir. 2013) (citing Fed. R. Civ. P. 56(a)).  When reviewing the record, "the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Id.* (quoting *Tysinger v. Police Dep't of City of Zanesville*, 463 F.3d 569, 572 (6th Cir. 2006)).  "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for [that party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  Summary judgment is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury." *Id.* at 251–52.  Indeed, "[c]redibility determinations, the weighing of the evidence, and the drafting of legitimate inferences from the facts are jury functions, not those of a judge."  *Id.* at 255.

## B

"Qualified immunity shields officials from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Brown v. Chapman*, 814 F.3d 447, 457 (6th Cir. 2016) (internal quotation marks omitted) (quoting *Mullenix v. Luna*,

136 S. Ct. 305, 308 (2015)). "This immunity 'gives government officials breathing room to make reasonable but mistaken judgments about open legal questions,' 'protect[ing] all but the plainly incompetent or those who knowingly violate the law.'" *Jacobs v. Alam*, 915 F.3d 1028, 1039 (6th Cir. 2019) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)).

"A plaintiff bears the burden of showing that a defendant is not entitled to qualified immunity." *Jacobs*, 915 F.3d at 1039. "To do so, a plaintiff must show '(1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct.'" *Id.* (quoting *al-Kidd*, 563 U.S. at 735). "On summary judgment, the court must analyze these questions after construing the facts in the light most favorable to the party asserting the injury and drawing all reasonable inferences in that party's favor." *Brown*, 814 F.3d at 457 (citing *Scott v. Harris*, 550 U.S. 372, 377 (2007)). The Court may answer these questions in any order, but "if either one is answered in the negative, then qualified immunity protects the official from civil damages." *Id.*

Even in the qualified immunity context, "courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Tolan v. Cotton*, 572 U.S. 650, 656 (2014). Rather, summary judgment continues to be "appropriate only if 'the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law.'" *Id.* at 656–57 (quoting Fed.

R. Civ. P. 56(a)).  Accordingly, when determining whether officers are entitled to qualified immunity at the summary judgment stage, "a court must view the evidence in the light most favorable to the opposing party." *Id.* at 657 (quotation omitted).

## IV

The Court first considers Fleming's claim that Scruggs and Garcia violated the Fourth Amendment by subjecting him to a *Terry* stop that was not supported by reasonable suspicion.  The Court concludes that the deputies did unlawfully stop Fleming but that they are entitled to qualified immunity from Fleming's claim regarding the stop.

## A

## 1

A law enforcement officer may conduct a *Terry* stop where he "has 'reasonable suspicion' that criminal activity may be afoot." *Dorsey v. Barber*, 517 F.3d 389, 395 (6th Cir. 2008) (citing *Terry v. Ohio*, 392 U.S. 1, 30–31 (1968)).  The Sixth Circuit has provided the following guidance for courts evaluating whether an officer's decision to conduct a *Terry* stop was supported by reasonable suspicion:

> "Reasonable suspicion" is an abstract concept: "It requires more than a mere hunch, but is satisfied by a likelihood of criminal activity less than probable cause, and falls considerably short of satisfying a preponderance of the evidence standard.  If an officer possesses a particularized and objective basis for suspecting the particular person of criminal activity based on specific and articulable facts, he may conduct a *Terry* stop.  Courts must examine the

totality of the circumstances to determine whether reasonable suspicion existed to justify a *Terry* stop."

*Id.* (quoting *Smoak v. Hall*, 460 F.3d 768, 778–79 (6th Cir. 2006)).

A reliable description of a suspect may provide a sufficient basis for a *Terry* stop of a person matching that description so long as the description sufficiently "winnow[s] the class of potential suspects." *United States v. Davis*, 341 F. App'x 139, 140–41 (6th Cir. 2009) (quoting *United States v. Powell*, 210 F.3d 373 (table op.), 2000 WL 357262, at *3 (6th Cir. Mar. 29, 2000)).  But a *Terry* stop of a person based on a description that "could describe any number of people in the neighborhood where [the person] was walking" would not be supported by reasonable suspicion because it "could not have provided a 'particularized and objective basis for suspecting [that] particular person.'" *King v. United States*, 917 F.3d 409, 426 (6th Cir. 2019) (quoting *Dorsey*, 517 F.3d at 395), *cert. granted on other grounds*,[3] *Brownback v. King*, No. 19-546, 2020 WL 1496620, at *1 (U.S. Mar. 30, 2020).

---

[3] The Supreme Court granted certiorari regarding a different issue that was also presented in *King*: whether the so-called "judgment bar provision" of the Federal Tort Claims Act precluded the plaintiff from pursuing his remaining claims against defendants. *See King*, 917 F.3d at 421; *Brownback v. King*, No. 19-546, 2020 WL 1496620, at *1 (U.S. Mar. 30, 2020).

## 2

"A tip – anonymous or not – may furnish reasonable suspicion necessary to justify a [*Terry*] stop." *United States v. Keeling*, 783 F. App'x 517, 521 (6th Cir. 2019). "Such a tip must pass muster under [*Illinois v. Gates*, 462 U.S. 213 (1983)], which directs [a court] to consider an informant's 'veracity,' 'reliability,' and 'basis of knowledge.'" *Id.* (quoting *Gates*, 462 U.S. at 230). A police officer's "subsequent corroboration" of a tip and whether the tipster was "known or anonymous" are also "relevant factors" in assessing the trustworthiness of a tip. *Id.* "These considerations are not independent requirements; instead, [a court must] consider them under the totality of the circumstances." *Id.* (citing *Gates*, 462 U.S. at 230); *see also United States v. Howard*, 632 F. App'x 795, 798–800 (6th Cir. 2015) (providing an overview concerning how to evaluate the reliability of a tip).

## 3

Moreover, an officer may make a *Terry* stop based upon a wanted bulletin issued by another law enforcement agency even if the officer does not have personal knowledge of the facts and circumstances supporting reasonable suspicion to make the stop. *See United States v. Hensley*, 469 U.S. 221, 232–33 (1985). The lawfulness of such a stop depends upon whether "the officer who issue[d] a wanted bulletin [had] a reasonable suspicion sufficient to justify [the] stop." *Id.* at 231 (citing *United*

*States v. Robinson*, 536 F.2d 1298, 1300 (9th Cir. 1976)).  As the Supreme Court

held in *Hensley*:

> We conclude that, if a flyer or bulletin has been issued on
> the basis of articulable facts supporting a reasonable
> suspicion that the wanted person has committed an
> offense, then reliance on that flyer or bulletin justifies a
> stop to check identification, to pose questions to the
> person, or to detain the person briefly while attempting to
> obtain further information. If the flyer has been issued in
> the absence of a reasonable suspicion, then a stop in the
> objective reliance upon it violates the Fourth Amendment.

*Id.* at 232 (citations omitted).

## B

The Defendants contend that the deputies had reasonable suspicion to stop

Fleming because:

> The physical description and location of Plaintiff was
> consistent with the information provided to Defendants.
> Plaintiff was an older African American male with facial
> hair, wearing a hat, and riding a bicycle in the same area
> as where the parole absconder was seen the day before.  In
> addition, the officers perceived Plaintiff's actions as trying
> to avoid them.  The totality of the circumstances presented
> justified the attempt to conduct a *Terry* stop of Plaintiff.

(Defs.' Supp. Br., ECF No. 28, PageID.568.)  The Defendants further insist that

"[t]he information [in the BOLO] came from MDOC so it was verifiable and

reliable." (*Id.*, PageID.565.)  But as described below, in several important respects,

this argument does not take the facts in the light most favorable to Fleming and does

not draw all reasonable inferences in Fleming's favor.

**1**

First, under the view of the facts that is most favorable to Fleming, the deputies were not told that the absconder was "older." While Scruggs testified that the description of the absconder stated that he was "older," (Scruggs Dep. at 30:11–32:17, ECF No. 18-5, PageID.166), Garcia's testimony is to the contrary. Garcia identified all of the information the deputies knew about the parole absconder, and he did not say that the description of the absconder stated that the absconder was "older." (*See* Garcia Dep. at 14:4–19, ECF No. 18-6, PageID.176.) Garcia's testimony is more favorable to Fleming on the question of whether the deputies were told that the absconder was "older," and, based upon that testimony, the Court must conclude for purposes of summary judgment that the deputies were not told that the absconder was "older."

Moreover, other portions of Scruggs' testimony suggest that the deputies were not told that the absconder was "older." For instance, Scruggs testified that the description of the absconder appeared in the BOLO (which does not say that the absconder is "older"), and Scruggs acknowledged that he did not have an additional description of the absconder from any "agent." (Scruggs Dep. at 30:11–32:17, ECF No. 18-5, PageID.166.) These portions of Scruggs' testimony are more favorable to Fleming than Scruggs' other testimony that the description identified the absconder

as "older," and thus the Court must credit this testimony for summary judgment purposes.

For all of these reasons, the view of the facts that is most favorable to Fleming supports the conclusion that the deputies were not told that the absconder was "older." Therefore, the Court disregards the Defendants' arguments that Fleming's "older" appearance supported reasonable suspicion to stop Fleming.

## 2

Next, the view of the facts that is most favorable to Fleming precludes the Defendants' argument that Fleming's "perceived" efforts "to avoid" the deputies supported reasonable suspicion. Garcia testified that the "sole basis" for the stop was Fleming's resemblance to the parole absconder and his location about a mile from where the absconder had been spotted. (Garcia Dep. at 14:9–10, ECF No. 18-6, PageID.176.) Given that testimony, the Defendants may not now seek to justify the stop on the ground that the deputies perceived Fleming to be fleeing.

Moreover, on this record, a reasonable jury could conclude that the deputies did not actually believe that Fleming was attempting to flee or to avoid them. Fleming has presented evidence that after Scruggs Tased him, Scruggs told another deputy that he (Scruggs) was "just going to tell the judge he ran." (Hunter Dep. at 38:23, PageID.404; *see also id.* at 14:13–14, PageID.380; Fleming Dep. at 73:14, ECF No. 21-2, PageID.294.) A jury could reasonably interpret this statement as an

admission by Scruggs that he was going to fabricate Fleming's alleged flight in order to justify his actions. That is not the only interpretation of Scruggs' statement, but it is a permissible one that must be adopted for purposes of summary judgment. And it further precludes the Defendants from taking the position at this stage in the proceedings that Fleming was fleeing from the deputies.

Finally, viewing the facts in the light most favorable to Fleming, the deputies could not *reasonably* have perceived that Fleming was engaging in the type of flight that would support reasonable suspicion. A suspect's flight or efforts to evade may support reasonable suspicion *where the suspect knows that the persons from whom he is fleeing are law enforcement officers*. *See, e.g.*, *Illinois v. Wardlaw*, 528 U.S. 119, 124 (2000) (holding that a suspect's "unprovoked flight upon noticing the police" supported reasonable suspicion); *United States v. Caruthers*, 458 F.3d 459, 466 (6th Cir. 2006) (holding that a suspect's "semi-running" after "he recognized Officer Stocks as a police officer" supported reasonable suspicion), *abrogated on other grounds by Cradler v. United States*, 891 F.3d 659, 671 (6th Cir. 2018). Here, the facts most favorable to Fleming are that the officers did not identify themselves, did not tell Fleming to stop, and were driving a car without external markings.[4]

---

[4] Fleming testified that the deputies did not identify themselves and did not give him any commands. (*See* Fleming Dep. at 52:12–53:13, 69:13, ECF No. 21-2, PageID.273–274, 290.) The Defendants nonetheless insist that the Court may credit the deputies' testimony that they did identify themselves and did tell Fleming to stop. The Defendants contend that Fleming's testimony establishes, at most, that he did

Given those facts, it would have been unreasonable for the deputies to conclude that Fleming knew he was being followed by law enforcement and, therefore, unreasonable for them to conclude that his continued pedaling of his bike as they trailed him was the type of flight that could support reasonable suspicion.[5]  For this additional reason, the deputies' alleged perception that Fleming was trying to "avoid" them does not support reasonable suspicion.[6]

---

not hear the deputies addressing him and that it does not exclude the possibility that, as they claim, they were, in fact, giving him commands. (*See* Reply, ECF No. 22, PageID.456–457.)   Seen from this perspective, the Defendants argue, Fleming's testimony does not necessarily conflict with the deputies', and the Court may find that the deputies did identify themselves and did give commands to Fleming.  The Court respectfully disagrees.  The record establishes that the deputies were between 10 to 15 yards away from Fleming when they claim to have addressed him.  A reasonable jury could find, after viewing the evidence in the light most favorable to Fleming, that (1) if the deputies had attempted to speak to Fleming from that range, Fleming would have heard them and (2) since Fleming did not hear them, they did not address him as they claim to have done.  Thus, for the purposes of summary judgment, the Court proceeds on the understanding that the deputies did not identify themselves or address Fleming in any way while following closely behind him.

[5] The Defendants correctly note that Fleming looked back toward the deputies' vehicle several times before the Tasing. (*See* Mot. for Summ. J., ECF No. 18, PageID.93.)   But the fact that Fleming looked back toward the vehicle does not compel a finding that Fleming knew that the vehicle contained police officers.  As described above, the vehicle did not have any markings identifying it as a police vehicle, its lights were located inside the vehicle, and the windows were tinted. (*See* Garcia Dep. at 12:12–22, ECF No. 18-6, PageID.175; Scruggs Dep. at 17:4–19:13, ECF No. 18-5, PageID.163.)   A reasonable jury could find, after viewing the evidence in a light most favorable to Fleming, that he did not know the vehicle contained law enforcement officers.

[6] The Court's determination, for summary judgment purposes, that Fleming was not fleeing is not based upon Fleming's subjective intent not to flee.  As the Defendants

**3**

In addition, the Defendants' contention that the "physical description and location of [Fleming] was consistent with the information" the deputies had received also fails to take the evidence in the light most favorable to Fleming.  As noted above, in several respects, Fleming's appearance and circumstances were not "consistent" with the deputies' information.  Fleming was not wearing the distinctive large neck chain mentioned in the BOLO.  He was wearing shorts, not blue jeans.  He had a graying goatee, not a dark-black beard.  And he was about one mile from where the absconder had been seen the day before.  Thus, when viewing the facts in the light most favorable to Fleming, the Court cannot accept the Defendants' repeated contention that Fleming's appearance and circumstances "matched" those of the absconder. (*See* Scruggs Dep. at 33:1–2, ECF No. 18-5, PageID.167.)  Instead, the Court must carefully consider both the points of similarity and the points of difference between Fleming and the absconder.

---

correctly note, Fleming's subjective intent does not control. (*See* Defs.' Supp. Br., ECF No. 28, PageID.573.)  Instead, what matters is how a *reasonable* officer would view Fleming's actions when the *objective* facts are viewed in the light most favorable to Fleming.  Here, for the reasons explained in text above, the Court determines that a reasonable officer – viewing the objective facts in the light most favorable to Fleming – would not have believed that Fleming was fleeing or attempting to evade.

**4**

Finally, the Defendants' contention that the information in the BOLO came from a known and reliable source fails to take the facts in the light most favorable to Fleming.  While it is true, as the Defendants note, that the BOLO came from the MDOC, the BOLO does not say that the MDOC developed the information in the BOLO.  On the contrary, the BOLO simply says that the MDOC "got a call" passing along the information in the BOLO.  The BOLO does not identify the caller, nor does the BOLO suggest that the call came from a law enforcement source or from any known or trusted source.  And there is no evidence in the record that the MDOC knew the caller's identity.   Under all of these circumstances, the Court cannot conclude for summary judgment purposes that the information in the BOLO came from an identified caller who was known to be reliable.

**C**

With these clarifications of the record in mind, the Court concludes that, under the totality of the circumstances, the deputies did not have reasonable suspicion to stop Fleming.

First, the sole basis for the stop was the deputies' belief that Fleming matched the description of the parole absconder in the BOLO, but the Defendants have not presented evidence that the BOLO, itself, was supported by reasonable suspicion. *See Hensley*, 469 U.S. at 232–33 (holding that an officer may make a *Terry* stop

based upon a bulletin only where the bulletin was "issued on the basis of articulable facts supporting a reasonable suspicion"). Indeed, there is no evidence in this record that the MDOC author of the BOLO had a sufficient basis on which to conclude that its contents were accurate. All of the information in the BOLO came from a caller, and there is no evidence before the Court that the MDOC employee knew the caller's identity or knew anything about the caller's veracity. Moreover, there is no evidence in the record that the MDOC employee (or anyone else) did anything to corroborate the information provided by the caller. Nor is there any evidence in the record as to whether the MDOC employee knew the caller's basis of knowledge – i.e., whether the caller personally saw the absconder at the Nebraska Street address or whether a third party told the caller that the absconder was at that address wearing the described apparel and riding a bike. Under these circumstances, the MDOC employee who issued the BOLO could not reasonably deem the tip from the caller to be reliable, and thus the MDOC employee lacked reasonable suspicion to detain a person matching the description of the absconder provided by the caller. And because there is no evidence that the MDOC employee had reasonable suspicion, the *Terry* stop of Fleming based on the BOLO authored by that employee was unlawful. *See id.*; *see also Feathers v. Aey*, 319 F.3d 843, 849–50 (6th Cir. 2003) (holding under *Hensley* that *Terry* stop based upon information from police dispatcher was unlawful where dispatcher lacked reasonable suspicion to support the stop); *Joshua v. DeWitt*, 341

24

F.3d 430, 440 (6th Cir. 2003) (explaining that a *Terry* stop based upon the identification of a suspect in a law enforcement "Read & Sign" book was unlawful where the prosecution failed to present evidence that the officer who provided the information in the book had reasonable suspicion to believe that the person stopped had committed a crime).

Second, even if the BOLO had been supported by reasonable suspicion, the stop of Fleming would still have been unlawful under *Terry* because the deputies lacked reasonable suspicion to believe that Fleming was the absconder described in the BOLO. Several important differences between Fleming and the description in the BOLO cut sharply against a finding that Fleming was the wanted man. In contrast to the description, Fleming was not wearing any "neck chain," much less a distinctive "big neck chain." He was not wearing jeans. He did not have a dark-black beard; he had a graying goatee. And he was roughly one mile from the location where the absconder had been seen the day before. These differences made it much less likely that Fleming was the parole absconder, and the deputies' failure to consider these distinctions undermines Defendants' claim that the deputies had reasonable suspicion to stop Fleming. *See Stanley v. Finnegan*, 899 F.3d 623, 628 (8th Cir. 2018) (explaining that a state "official is not free to disregard plainly exculpatory evidence when it undermines inculpatory evidence that reasonable

suspicion exists"); *cf. Gregory v. City of Louisville*, 444 F.3d 725, 743 n.6 (6th Cir. 2006) (applying same principle in context of probable cause to arrest).

Third, the similarities that did exist between Fleming and the BOLO did not sufficiently suggest that Fleming was the absconder. The similarities were at a relatively high level of generality – both Fleming and the absconder were black men with facial hair and a ball cap riding a bike. As Fleming persuasively observes, that description could have fit a reasonably large number of individuals in Pontiac – a city with a large black population and a high poverty rate whose under-resourced residents may be unable to afford cars and may rely on bicycles to get around.[7] Because the similarities between Fleming and the BOLO would appear to be common to "any number of people" in Pontiac, they fall short of establishing particularized reasonable suspicion.[8] *King*, 917 F.3d at 426.

---

[7] "The ACS Demographic and Housing Estimates for 2013-2017 in the City of Pontiac, Michigan (where the incident occur[r]ed), provides that the total population during this time period is estimated at 60,039, with 29,106 being male and approximately 17,641 persons being over the age of 45 years old, if you include persons 35 to 44 years old there are approximately 33,438 persons in that age group. The City is 20.28 square miles with a population density of 3,007 persons per square mile. The race of individuals residing in Pontiac at the time is predominantly African American with an estimate of 29,289 persons. The median household income is just a little over $33,000. Approximately 31% live in poverty making it more likely than not that these 31% have no transportation or transportation other than a motor vehicle, i.e. bicycle." (Pl.'s Supp. Br., ECF No. 25, PageID.474; citing Pontiac Demographic Report, ECF No. 25-4.)

[8] The cases cited by Defendants are not to the contrary. (*See* Reply, ECF No. 22, PageID.455–456; Defs.' Supp. Br., ECF No. 28, PageID.566–571.) In those cases,

For all of these reasons, the Court concludes that the evidence, when viewed in Fleming's favor, supports the conclusion that Scruggs and Garcia violated Fleming's Fourth Amendment rights by conducting a *Terry* stop without "reasonable suspicion, grounded in specific and articulable facts, that [the] person they encounter[ed] was involved in or is wanted in connection with a completed felony." *Id.* at 423.

## D

The Court concludes, however, that the deputies have qualified immunity for the unlawful stop of Fleming. In *Hensley*, the Supreme Court explained that where, as here, a law enforcement officer makes a *Terry* stop based upon a BOLO that is

---

officers stopped suspects who (a) were found in a location that bore a close and/or logical relationship to a recent crime and (b) matched descriptions given by witnesses. *See United States v. Babb*, 77 F. App'x 761, 763, 767 (6th Cir. 2003) (upholding stop of suspect one hour after a bank robbery where suspect matched the BOLO's description of a "black male of a certain age and size, driving a silver or grey Oldsmobile Alero with blue and white Michigan plates" and where the suspect was spotted driving away from the area of the robbery); *United States v. Caruthers*, 458 F.3d 459, 462 (6th Cir. 2006) (upholding stop of suspect ten minutes after a central dispatcher received a distress call where suspect matched the tipster's description of a "[m]ale black. . . . Red shirt, shorts, fired gun in the air" who was located in a high-crime area, nobody else was spotted in the area, and the suspect "took off in a hurried[] fashion" when approached by the officers); *United States v. Lindsey*, 114 F. App'x 718, 722–23 (6th Cir. 2004) (upholding stop of suspect after a shooting where suspect matched descriptions provided by a caller and other witnesses of a black man wearing a dark-colored jacket and where the suspect was observed running less than a mile from the scene). None of these cases support the stop of Fleming a full day after, and roughly a mile away from, the sighting of the alleged absconder – especially given the differences between Fleming's appearance and that of the absconder.

issued in the absence of reasonable suspicion, the officer "may have a good-faith defense to any civil suit" – i.e., may have qualified immunity from any claim – arising out of the stop. *Hensley*, 469 U.S. at 232–33.[9]  "It is the objective reading of the flyer or bulletin that determines whether other police officers can defensibly act in reliance on it." *Id.*

Under this test from *Hensley*, the Sixth Circuit has extended qualified immunity to officers who made an unlawful *Terry* stop under circumstances like those presented here. *See Feathers*, 319 F.3d at 851.  In *Feathers*, a police dispatcher received an anonymous tip that a bearded white male on a porch looked "pretty drunk" and "pointed something" at the tipster as the tipster walked by on North Howard Street in Akron, Ohio.  The dispatcher informed patrol officers of the tipster's report and directed the officers to the North Howard Street area.  The dispatcher did not tell the patrol officers that the tipster had been anonymous.

---

[9]  While "*Hensley* spoke in terms of 'a good-faith defense to any civil suit,'" "[t]he result is the same under [the] qualified immunity analysis of *Harlow* and *Anderson v. Creighton*, 483 U.S. 635 (1987)." *Borlawsky v. Town of Wyndham*, No. 99-272, 2000 WL 761016, at *1 n.2 (D. Me. Mar. 31, 2000).  Indeed, the Sixth Circuit has recognized the overlap between the *Hensley* good-faith defense and qualified immunity. *See, e.g.*, *Feathers*, 319 F.3d at 851 (explaining that officer was entitled to qualified immunity for *Terry* stop made under "precisely the scenario" that would have entitled him to the "good-faith" defense under *Hensley*); *Humphrey v. Mabry*, 482 F.3d 840, 848–49 (6th Cir. 2007) (citing *Hensley* as support for the test to be applied for determining when an officer who acts based upon information received from another officer is entitled to qualified immunity).

Upon arriving in the area, the patrol officers saw Feathers sitting on his porch, and they concluded that Feathers matched the description provided by the dispatcher. They approached Feathers and commanded him to take his hands out of his pockets. Feathers disobeyed the commands and began heading into the house.  The officers then grabbed Feathers, and a struggle ensued.  The officers ultimately got Feathers under control and arrested him.  Feathers was charged with assaulting the officers, carrying a concealed weapon, and resisting arrest.  The resisting arrest and concealed weapons charges were dismissed, and Feathers was acquitted of the assault charge at trial.  Feathers thereafter brought a civil action against the officers, and he alleged, among other things, that the officers lacked reasonable suspicion for their *Terry* stop of him (that occurred as he sat on his porch).

The Sixth Circuit agreed with Feathers that the *Terry* stop was unlawful.  The court explained that under *Hensley*, the lawfulness of the stop depended upon whether "the dispatcher had sufficient information to find reasonable suspicion" for the stop. *Id.* at 849.  And the court concluded that the dispatcher lacked such information because the dispatcher knew that the tipster was anonymous and because the dispatcher had no basis on which to deem the tip reliable. *See id*. at 849–50.

But the Sixth Circuit "[n]onetheless" concluded that "Feathers [could not] overcome the officers' qualified immunity." *Id*. at 851.  The officers were entitled

to such immunity under *Hensley* because they reasonably relied upon the information they received from the dispatcher:

> Based on the information that [the officers] had themselves, the *Terry* stop was reasonable. The dispatcher informed the officers of a suspicious person who was possibly intoxicated and supposed to be carrying a weapon. Although this information was from an anonymous tipster, whose information was not sufficient to create reasonable suspicion under *J.L.*, *the officers knew only what had been reported from the dispatch, and efficient law enforcement requires—at least for the purposes of determining the civil liability of individual officers—that police be permitted to rely on information provided by the dispatcher. If the dispatcher's information were accurate and reliable, as the police presumed, the totality of circumstances would justify the* Terry *stop. This is precisely the scenario contemplated in* Hensley, *in which, after reasoning that a stop based on a bulletin that was itself issued in the absence of reasonable suspicion would violate the Fourth Amendment, the Supreme Court stated that, "[i]n such a situation, of course, the officers making the stop may have a good-faith defense to any civil suit."* Hensley, 469 U.S. at 232, 105 S.Ct. 675. So although the stop violated the Fourth Amendment because the authorities' collective information did not amount to reasonable suspicion, Feathers cannot prevail in a § 1983 suit because the individual defendants had a sufficient factual basis for thinking that they were acting consistently with *Terry*.

*Id.* at 851 (emphasis added).

In this case, Scruggs and Garcia were in much the same position as the patrol officers in *Feathers*. Like those officers, Scruggs and Garcia (1) were informed that law enforcement (the MDOC) had received a report concerning a suspect and (2)

were not given any information that directly called into question the reliability of the report.[10]  Thus, as in *Feathers*, Scruggs and Garcia were "permitted to rely on [the] information provided by" the MDOC – "at least for purposes of determining [their] civil liability." *Id.*  Stated another way, Scruggs and Garcia may not be held liable on the theory that they conducted a stop based upon a BOLO that was not supported by reasonable suspicion.

But the question remains: may they be held liable for their erroneous determination that they had reasonable suspicion to stop Fleming based upon his resemblance to the parole absconder described in the BOLO?  They may not.  While the Court has concluded that, under the totality of the circumstances, the resemblance was not close enough to support reasonable suspicion, the Court cannot say that that lack of reasonable suspicion would have been clear to every reasonable officer.  There were at least some meaningful similarities between Fleming and the parole absconder, and it is possible that a reasonable officer could have mistakenly deemed those similarities sufficient to establish reasonable suspicion that Fleming was the absconder.

---

[10] While the BOLO did not identify the tipster, it did not affirmatively state that the tipster was anonymous or wished to remain anonymous.  If the BOLO had so stated, then Scruggs and Garcia could not have reasonably relied upon it. *See Srisavath v. City of Brentwood*, 243 F. App'x 909 (6th Cir. 2007).

Fleming has not cited any clearly established federal law that would have put Scruggs and Garcia on notice that they lacked reasonable suspicion for the stop. *See Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (emphasizing that a plaintiff's burden to cite an on-point case demonstrating that "the violative nature of particular conduct is clearly established" is "especially important in the Fourth Amendment context, where the Court has recognized that [i]t is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts" (quotation marks and emphasis omitted)).   Fleming primarily relies upon the Sixth Circuit's decision in *King*, *supra*.  But that case falls short for at least two reasons.  First, the Sixth Circuit decided *King* several years after Scruggs and Garcia stopped Fleming.  Thus, Scruggs and Garcia were not on notice as to how the court would have applied the governing law to facts like those presented in *King*.  Second (and more importantly), the facts in *King* are not close enough to those present here that the decision in *King* may be said to put the deputies' lack of reasonable suspicion "beyond debate." *Hernandez v. Boles*, 949 F.3d 251, 261 (6th Cir. 2020) (quoting *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018)).  The officers in *King* conducted a *Terry* stop of King based upon a seven-year-old photo of a suspect that bore essentially no resemblance to King.  And the officers did not observe King engage in the behaviors that the suspect was known to engage in.  Here, in contrast, Fleming did bear at least some resemblance to the parole absconder

pictured on the BOLO, and Fleming, like the absconder, was riding a bike. For these reasons, *King* would not have put every reasonable officer on notice that reasonable suspicion to stop Fleming did not exist. And because Fleming has not cited any other cases that would have provided such notice to Scruggs and Garcia, they are entitled to qualified immunity for the unlawful stop of Fleming.

## V

Next, the Court turns to Fleming's allegation that the Tasing was an excessive use of force. (*See* Fleming Resp., ECF No. 21, PageID.209–212.) The deputies are not entitled to qualified immunity on that claim.

## A

Fleming's excessive force claim arises under the Fourth Amendment. *See King*, 917 F.3d at 429. The claim is to be evaluated under the following standard:

> "[T]he right to be free from the excessive use of force is a clearly established Fourth Amendment right." *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 902 (6th Cir. 2004) (quoting *Neague v. Cynkar*, 258 F.3d 504, 507 (6th Cir. 2001)). The Supreme Court has explained that "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Graham v. Connor*, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). Rather, "the question is whether the officers' actions [were] 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397, 109 S.Ct. 1865. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain,

and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396, 109 S.Ct. 1865. Therefore, to determine whether the use of force in a particular situation was reasonable, this Court must look to the totality of the circumstances. *See id.*; *Dickerson v. McClellan*, 101 F.3d 1151, 1161 (6th Cir. 1996) (citing *Tennessee v. Garner*, 471 U.S. 1, 8–9, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985)). In doing so, the court must assume "the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396, 109 S.Ct. 1865. The analysis of whether an officer's use of force was reasonable is guided by the following three factors: (1) the severity of the crime at issue; (2) whether the suspect posed an immediate threat to the safety of the officers or others; and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight. *Sigley v. City of Parma Heights*, 437 F.3d 527, 534 (6th Cir. 2006).

*Id.* at 429–30.

The Sixth Circuit has adopted a "segmented analysis" for analyzing excessive force claims. *Livermore ex rel. Rohm v. Lubelan*, 476 F.3d 397, 407 (6th Cir. 2007). Under this approach, a court must consider "the totality of the circumstances facing [a police officer] at the time [he] made [his] split-second judgment[] immediately prior to using . . . force." *Chappell v. City of Cleveland*, 585 F.3d 901, 909 (6th Cir. 2009). "The relevant time for the purposes of this inquiry is the moment immediately preceding the shooting," or – in Fleming's case – the Tasing. *Bouggess v. Mattingly*, 482 F.3d 886, 890 (6th Cir. 2007). In other words, "it is the reasonableness of the 'seizure' that is the issue, not the reasonableness of the [officers'] conduct in time segments leading up to the seizure." *Chappell*, 585 at 909.

**B**

The Defendants insist that the Tasing of Fleming was justified for the following reasons:

> From the officer's perspective, when they attempted to approach Plaintiff, he avoided them on his bicycle, disregarded verbal commands to stop, and then placed his hand in his pocket as the officers[] approached. From the perspective of an officer, he was approaching a convicted felon that was actively trying to flee and reached into his pocket to possibly retrieve a weapon. These actions constitute active resist[a]nce and the use of a taser under the circumstances was a proper use of force. Even if Plaintiff is not deemed to be trying to flee, placing his hand in his pocket posed a threat to the officers that justified the use of force to protect Defendants' own safety. While Plaintiff's explanation may offer some information about why he did not stop, the events must be viewed from the perspective of an officer on the scene.

> * * *

> [A]n officer is able to use force in response to circumstances presenting a risk of harm to the officer or others. In addition, the above cases support Defendant Scruggs' belief that an individual reaching into a pocket presents the risk of retrieving a weapon and that the use of force, even deadly force, in response to the potential harm presented by an individual pulling out a weapon does not constitute excessive force. Plaintiff's actions of reaching into his pocket posed a risk to the officers that makes the use of a taser to protect the officers objectively reasonable and defeats Plaintiff's claim for excessive force.

(Defs.' Supp. Br., ECF No. 28, PageID.573, 576.)  But the Defendants again fail to take the facts in the light most favorable to Fleming and fail to draw all reasonable inferences in Fleming's favor.

To begin, as described above (*see supra*, Section IV.B.1–4), the facts in the light most favorable to Fleming do not support the Defendants' contention here that Fleming was fleeing from them or that they reasonably could have believed that Fleming was fleeing.  Likewise, under the most favorable view of the facts for Fleming, the deputies did not give Fleming any commands, and he did not ignore any commands.  Moreover, viewing the facts in the light most favorable to Fleming does not support the deputies' claim that Fleming "placed his hand in his pocket as the officers' approached." (Defs.' Supp. Br., ECF No. 28, PageID.573.)  Video footage from the deputies' vehicle is inconclusive on this point; at most, the video shows that Fleming moved his left hand *toward* his left pocket, but it is not clear that Fleming reached his hand *into* his pocket. (*See* Dashcam Video at 01:40–01:46, ECF No. 18-4.)  And Fleming testified that "I never put my left hand in my pocket." (Fleming Dep. at 66:17, ECF No. 21-2, PageID.287.)  For purposes of summary judgment, the Court may conclude only that Fleming moved his hand toward his pocket, not that he reached his hand into his pocket.

## C

Having clarified the facts in the light most favorable to Fleming, the Court concludes that a reasonable jury could find that the Tasing of Fleming amounted to excessive force.  As noted above, the analysis of whether an officer's use of force was reasonable is guided by the following three factors: (1) "the severity of the crime at issue"; (2) "whether the suspect posed an immediate threat to the safety of the officers or others"; and (3) whether the suspect was "actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396; *see also Sigley*, 437 F.3d at 534.  When the evidence is viewed in Fleming's favor, a reasonable jury could find that none of these three factors support the Tasing of Fleming.

First, the crime at issue – failing to report for parole – was not severe.  Failing to report is not a crime of violence and poses only an indirect threat to the public.  Moreover, the deputies did not know anything about the underlying offense for which the absconder was on parole. (*See* Garcia Dep. at 14:4–8, ECF No. 18-6, PageID.176.)  They had no idea, for instance, whether the absconder was on parole for a non-violent offense like fraud or drug possession or whether he had committed a more serious offense.  Thus, a jury could reasonably find that the mere fact that the absconder was on parole does not support the decision to deploy a Taser.

Second, a jury could reasonably find that Fleming did not pose an immediate threat to the safety of the deputies or others.  He was riding away from the deputies,

not seeking to confront them.  And the deputies had no reasonable basis to believe that Fleming was armed.  They had no information that the parole absconder whom they believed Fleming to be was armed, and they did not see Fleming with a weapon (or with any bulge in his pockets that could potentially have been a weapon).  They saw only an ambiguous move of Fleming's hand toward his pocket as he rode away from them.  On this record, a jury could reasonably find that that one vague movement, standing alone, did not amount to a threat to officer safety.  Indeed, there is a question of fact as to what that vague movement actually was.  Moreover, there is evidence in the record from which a reasonable jury could conclude that the deputies, themselves, did not believe that they needed to Tase Fleming to neutralize a threat that he posed.  As noted above, after Scruggs Tased Fleming, Scruggs said: "I'm just going to tell the judge he ran." (Hunter Dep. at 38:23, PageID.404; *see also id.* at 14:13–14, PageID.380; Fleming Dep. at 73:14, ECF No. 21-2, PageID.294.) A jury could reasonably interpret this statement by Scruggs as an admission that he had no basis for Tasing Fleming and that he thus had to fabricate a justification.  For all of these reasons, on this record a reasonable jury could conclude that Fleming did not pose an immediate threat to the deputies' safety or to the safety of others.

Third, as explained in detail above, a jury could reasonably conclude that Fleming was not actively resisting arrest or attempting to evade arrest by law

enforcement.  Instead, a jury could conclude that he was steadily riding his bicycle away from an unidentified vehicle that he perceived as a possible threat.

Since a jury could reasonably find that none of the relevant factors weigh in favor of the Tasing of Fleming, the Defendants are not entitled to summary judgment on the ground that the Tasing did not amount to an excessive use of force.

The cases cited by the Defendants to support the deputies' use of force are easily distinguishable.  Those cases involved more credible and immediate threats to officer safety than Scruggs and Garcia faced. (*See* Defs.' Supp. Br., ECF No. 28, PageID.571–577.)  For instance, in one of the cases cited by the Defendants, the court held that an officer reasonably used deadly force against a suspect where the suspect "had made threats to kill any officer that came to arrest him," the officer who fired the deadly shot saw another officer running down the suspect's front yard with his gun drawn, and the shooting officer had heard other officers yelling "sheriff's office," "let us see your hands," and "gun, gun, gun." *Hickman v. Moore*, Nos. 3:09-cv-69, 3:09-cv-102, 2011 WL 122039, at *9 (E.D. Tenn. Jan. 14, 2011).  In another case cited by the Defendants, the court held that an officer reasonably believed that a suspect was armed based upon a citizen's report that the suspect was armed, the officer's uncontradicted observation of a gun-shaped bulge near the suspect's waistband, and the suspect – after being ordered to put his hands over his head – "lowering his hands in the direction of the bulge in disregard of the officers' order."

*Anderson v. Russell*, 247 F.3d 125, 130 (4th Cir. 2001).  The facts of these cases bear scant resemblance to the facts of this case (when the facts are viewed in the light most favorable to Fleming).

For all of these reasons, a jury could reasonably find the deputies violated Fleming's Fourth Amendment right to be free from the use of excessive force when they Tased him.

## D

The Court further concludes that the deputies are not entitled to qualified immunity because Fleming's right to be free from Tasing when neither fleeing nor actively resisting was clearly established at the time Fleming was Tased.  Before Fleming was Tased, the Sixth Circuit had held that the "use of a Taser on a non-resistant subject" violates clearly established federal law. *Kijowski v. City of Niles*, 372 F. App'x 595, 601 (6th Cir. 2010); *see Brown*, 814 F.3d at 461–62 ("[A]n individual's right to be free from a taser is clearly established when the individual is not actively resisting arrest or is already detained."); *Hagans v. Franklin Cty. Sheriff's Office*, 695 F.3d 505, 509–10 (6th Cir. 2012) ("[W]hen we have found excessive force, the suspects were compliant or had stopped resisting. . . . A suspect's active resistance also marks the line between reasonable and unreasonable tasing in other circuits.").  As explained above, on the facts most favorable to Fleming, he was neither resisting nor fleeing at the instant he was Tased.  And a

Tasing under those circumstances would have violated clearly established federal law.

**E**

In sum, Scruggs and Garcia are not entitled to qualified immunity on Fleming's excessive force claim because (1) the facts, viewed in the light most favorable to Fleming, are sufficient to support a finding that the Tasing of Fleming amounted to excessive force and (2) Fleming's right to be free from a Tasing under those facts was clearly established.

**F**

The above analysis holds both deputies – Scruggs and Garcia – equally accountable for the Tasing. Defendants argue that Fleming "cannot assert a claim against Deputy Garcia for excessive force or any other tort claim" because Garcia was only driving the police car and Fleming failed "to even allege [that] Deputy Garcia was involved in tasing Plaintiff." (Mot. for Summ. J., ECF No. 18, PageID.105–106.) The Court disagrees. As the driver of the police vehicle, Garcia was responsible for following Fleming and positioning the vehicle so that Scruggs could deploy his Taser on Fleming. Thus, Fleming has shown that Garcia "actively participated in the use of excessive force" and therefore is subject to liability. *Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010) (quoting *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997)).

## VI

The Court next turns to Fleming's municipal liability claim under 42 U.S.C. § 1983.  Fleming argues that Defendant Oakland County is liable for the deputies' use of excessive force because it had a "practice, policy, or custom which caused a violation of his rights." (Fleming Resp., ECF No. 21, PageID.213; citing *Monell v. Dep't of Soc. Servs. Of City of New York*, 436 U.S. 658 (1978).)  Fleming's *Monell* claim is premised on the County's alleged failure to train its deputies. (*See id.*, PageID.213–216.)  The Court concludes that Fleming's *Monell* claim against Oakland County fails as a matter of law.

"To succeed on a municipal liability claim, a plaintiff must establish that his or her constitutional rights were violated and that a policy or custom of the municipality was the 'moving force' behind the deprivation of the plaintiff's rights." *Miller v. Sanilac Cty.*, 606 F.3d 240, 254–55 (6th Cir. 2010).  A plaintiff may demonstrate such a policy or custom by showing that the municipality's training of its police officers was so inadequate that its "failure to train amounts to *deliberate indifference* to the rights of the persons with whom the police come into contact." *Id.* (quotation omitted) (emphasis in original).  "To establish deliberate indifference, the plaintiff must show prior instances of unconstitutional conduct demonstrating that the County has ignored a history of abuse and was clearly on notice that the

training in this particular area was deficient and likely to cause injury." *Id.* (quotation omitted).

Fleming has not demonstrated that Oakland County "has ignored a history of abuse." *Id.* In support of his municipal liability argument, he cites the deposition of Oakland County Sherriff's Lieutenant Russell Yeiser, who has instructed OCSO deputies on Taser use since approximately 2007. (*See* Fleming Resp., ECF No. 21, PageID.215–216; citing Yeiser Dep. at 20–21, ECF No. 21-4, PageID.359–360.) When Yeiser was asked whether he was aware of "an Oakland County deputy or sheriff or anybody using a Taser that you thought was improper," Yeiser answered "I'm sure there has. I don't remember specifics." (Yeiser Dep. at 20:15–23, ECF No. 21-4, PageID.359.) But Yeiser's speculation that a deputy or sheriff might have used a Taser in an "improper" manner is not evidence that an OCSO deputy deployed a Taser against a suspect in an unwarranted manner. There are many ways to use a Taser "improperly," including, for instance, by using an improper technique. Fleming did not follow-up with Yeiser to determine whether Yeiser was admitting that deputies had used a Taser against a suspect under circumstances that did not warrant the use of the device. Yeiser's vague acknowledgment of "improper" Taser use is insufficient to support a finding that (1) Oakland County was aware that deputies were using Tasers under circumstances that amounted to excessive force and (2) failed to act on that knowledge. Moreover, Fleming has not presented any

specific evidence a history of Taser abuse by OCSO deputies, nor specific evidence that Oakland County has ignored such a history. Under these circumstances, Fleming's municipal liability claim fails.

## VII

Finally, the Court turns to Fleming's state-law tort claims against the Defendants for gross negligence, willful and wanton misconduct, assault, battery, and intentional infliction of emotional distress. (*See* Compl., ECF No. 1, PageID.7–10.)

Defendant Oakland County is immune against these tort claims under the GTLA. Under the GTLA, "a governmental agency is immune from tort liability if the governmental agency is engaged in the exercise or discharge of a governmental function." Mich. Comp. Laws § 691.1407(1). Oakland County is a "governmental agency" under the GTLA, *see North v. Macomb Cty.*, No. 10-11377, 2011 WL 4576848, at *5 (E.D. Mich. 2011) (citing Mich. Comp. Laws § 691.1401(a)–(d)), and "the operation of a law enforcement agency is a governmental function." *Wright v. Genesee Cty. Corp.*, 659 F. Supp. 2d 842, 852 (E.D. Mich. 2009). Thus, Oakland County is immune from Fleming's tort claims because the claims arose from its operation of its law enforcement agency (the OCSO). *See id.*

Defendants Scruggs and Garcia, however, are not immune from Fleming's tort claims. Under Michigan law, a law enforcement officer is entitled to GTLA

immunity against intentional tort claims if, among other things, the officer acts in good faith:

> If the plaintiff pleaded an intentional tort, determine whether the defendant established that he is entitled to individual governmental immunity under the *Ross* test by showing the following:
>> (a) The acts were undertaken during the course of employment and the employee was acting, or reasonably believed that he was acting, within the scope of his authority,
>> (b) the acts were undertaken in good faith, or were not undertaken with malice, and
>> (c) the acts were discretionary, as opposed to ministerial.

*Odom v. Wayne Cty.*, 760 N.W.2d 217, 228 (Mich. 2008).

Viewing the evidence in the light most favorable to Fleming, a reasonable jury could conclude that Scruggs and Garcia did not act in good faith in connection with the Tasing of Fleming. As noted above, after Scruggs Tased Fleming, Scruggs said that he would "tell the judge he ran." (Hunter Dep. at 38:23, ECF No. 21-5, PageID.404; *see also id.* at 14:13–14, PageID.380; Fleming Dep. at 73:14, ECF No. 21-2, PageID.294.) A jury could reasonably interpret this statement by Scruggs as an admission that there was no basis for the Tasing of Fleming and that he thus had to fabricate a justification. Since a jury could find that Scruggs admitted a lack of justification for the Tasing, there is at least a question of fact as to whether the deputies acted in good faith when they Tased Fleming. Accordingly, the deputies

are not entitled to summary judgment on Fleming's state-law tort claims arising out of the Tasing.

## VIII

Accordingly, for all the reasons stated above, Defendants' Motion for Summary Judgment (ECF No. 18) is **DENIED** with respect to Fleming's constitutional and state-law claims against Defendants Scruggs and Garcia arising out of the Tasing, and those claims may proceed to trial.   In all other respects, the motion is **GRANTED**.

**IT IS SO ORDERED**.

s/Matthew F. Leitman
MATTHEW F. LEITMAN
UNITED STATES DISTRICT JUDGE

Dated:  June 3, 2020

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on June 3, 2020, by electronic means and/or ordinary mail.

s/Holly A. Monda
Case Manager
(810) 341-9764
